# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **DOROTHY CHARLES**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:06CV00076 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | Chief United States District Judge |
| **SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Larry G. Browning, Browning, Lamie, & Gifford, P.C., Lebanon, Virginia, for Plaintiff; Sara Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Dorothy A. Charles filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2006) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial

evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff applied for benefits on May 2, 2005, alleging disability since January 31, 2005. This claim was denied on July 14, 2005, and upon reconsideration on September 9, 2005. The plaintiff requested and received a hearing before an administrative law judge ("ALJ") on March 2, 2006. By decision dated March 22, 2006, the ALJ found the plaintiff was not disabled within the meaning of the Act. The Social Security Administrations's Appeal Council denied review on May 30, 2006, and the ALJ's opinion constitutes the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

II

The plaintiff's medical records show that she was treated by primary care physicians at Slate Creek Physicians from August 14, 2003 to November 5, 2004. On August 14, 2003, the plaintiff was seen by Dr. William Lester. The plaintiff's chief

-2-

complaint was increased blood pressure and a persistent cough. Dr. Lester noted that she was not in any acute distress and that there was no sign of edema on her lower extremities. (R. at 173.) On October 22, 2003, the plaintiff returned to Dr. Lester for a follow-up appointment to check her blood pressure. (R. at 172.) Her cough had improved and she showed no signs of chest pains or shortness of breath. (*Id.*) On March 1, 2004, the plaintiff returned to Slate Creek Physicians for a routine follow up appointment. Dr. Uma Subramanian noted that the plaintiff had been feeling fine. (R. at 171.) The plaintiff denied having exertional chest pain, shortness of breath, orthopnea, lightheadedness, dizziness, or edema. (*Id.*)

On November 5, 2004, the plaintiff was seen by Dr. Halim Muslu at Slate Creek Physicians to obtain a prescription to treat her hypertension. (R. at 167.) Additionally, she complained of being depressed, decreased sleep, shortness of breath, and panic attacks. (*Id.*) Dr. Muslu prescribed Zoloft for the plaintiff's symptoms of depression and anxiety and Lipitor for high cholesterol. *(Id.)*

Dr. Favi K. Titha performed a consultative medical examination on June 29, 2005. The plaintiff told Dr. Titha she was disabled due to low back pain and pain in her knee joints. (R. at 176.) The plaintiff reported that she had pain in the lower and mid-back area that got worse during the night. However, she stated that Ultram helped relieve the pain. (*Id.*) Although the plaintiff demonstrated some tenderness

during the physical examination, her straight let raising sign was negative. (R. at 179.) She was able to demonstrate flexion and extension of the spine, and lateral flexion bilaterally with no elicited deficits. (*Id.*) Dr. Titha observed that the plaintiff was not in any acute distress during any point of the examination and that she did not need to use any type of cane, crutch, or walker for ambulation. (R. at 177.) The X ray of the plaintiff's lumbar spine showed very mild rotary curvature of the lumbar spine with degenerative change marked at the L4-L5 level. (R. at 181.) Although Dr. Titha noted that the plaintiff had a flat affect and appeared depressed, she denied having any suicidal ideation or severe depressive symptoms. (R. at 179.) Dr. Titha opined that such symptoms would not affect the plaintiff's activities of daily living or job activities. (*Id.*)

Dr. Titha determined that the plaintiff could sit, stand, or walk in an eight-hour workday for four to five hours, and that she could both lift and carry twenty pounds during more than two-thirds of the day. (*Id.*)

In July of 2005, state agency psychologist Howard Leizer, Ph.D., reviewed the plaintiff's medical records in order to assess her mental residual functional capacity ("RFC"). (R. at 182-95.) The plaintiff was noted to have a mild degree of limitations in respect to her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Dr. Leizer determined that the

medical evidence before him established that the plaintiff had a medically determinable impairment of low back pain. (R. at 194.) However, he noted that her described daily activities were not significantly limited in relation to her alleged symptoms.

In July of 2005, Dr. Frank Johnson also examined the plaintiff's medical records in order to assess her physical RFC. (R. at 196.) Based upon a review of these records and the plaintiff's own description of her daily activities, Dr. Johnson concluded that the plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, stand and walk (with normal breaks) for about six hours in an eight-hours workday, and sit (with normal breaks) for about six hours in an eight-hour workday. (R. at 197.) The plaintiff's medical records also failed to establish any manipulative, visual, communicative, or environmental limitations. (R. at 198-99.)

On October 20, 2005, the plaintiff underwent a behavioral health consultation at Stone Mountain Health Services. The plaintiff reported that she often feels very stressed and overwhelmed due to her spouse's poor health and their finances. The plaintiff was assessed as having significant situational stressors and depressive features were noted in her mood. (R. at 225.)

On December 15, 2005, the plaintiff returned for a follow-up appointment at Stone Mountain Health Services. The plaintiff again reported feeling overwhelmed

by stressors in her life. However, she denied any suicidal or homicidal ideations. (R at 224.) She reported her back pain was getting worse because she had no one to assist her in lifting and pulling her husband who has been disabled by a stroke since April of 2003.

On December 8, 2005, Dr. James Brasfield, a neurosurgeon, examined the plaintiff. (R. at 222.) A physical examination revealed that the plaintiff had normal sensory function, minimal lumbar paraspinal and spinous process, tenderness bilaterally, negative straight leg raising test, 5/5 motor strength, normal deep tendon reflexes, no pain with internal and external rotation of the hips bilaterally, and no pain with bilateral flexion of the hips. (*Id.*) The plaintiff was diagnosed with low back pain. (R. at 223.)

On January 2, 2006, the plaintiff was examined by B. Wayne Lanthorn, Ph.D., a psychologist, after being referred by her attorney. Dr. Lanthorn characterized the plaintiff's mood during the examination as predominately depressed with clear signs of anxiety. (R. at 212.) The plaintiff reported that following her husband's stroke she is his primary caretaker. (*Id.*)

Dr. Lanthorn administered a personality assessment inventory that showed the plaintiff was having difficulties, with a mild to moderate degree of depressive symptomatology. (R. at 215.) She was also experiencing some degree of stress and

anxiety.  (*Id.*)  Dr. Lanthorn reported that the plaintiff appears to have experienced a change in physical functioning in a manner often associated with depression, characterized by sleep disturbance, and a decrease in energy and level of sexual interest.  (*Id.*)  Her test results also indicated that she is experiencing some degree of stress and anxiety.  Dr. Lanthorn also noted that the plaintiff was experiencing no significant problems in such areas as antisocial behavior, undue suspiciousness or hostility, extreme moodiness or impulsivity, or unusually elevated mood or heightened activity level.  (R. at 215-16.)

The plaintiff was diagnosed by Dr. Lanthorn as having pain disorder, mood disorder, and anxiety disorder.  (R. at 216.)  He assessed her Global Assessment of Functioning("GAF")[1] at fifty-sixty.

The plaintiff was noted to have a slight limitation in her ability to understand, remember, and carry out short, simple instructions; and a moderate limitation in her ability to make judgments on simple work-related decisions and to interact

---

[1] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health.  The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score below 50, moderate difficulty in functioning at 60 and below, some difficulty in functioning at 70 and below, and no more than slight impairment in functioning at 80 and below.  Superior functioning is represented by 100.  *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

appropriately with the public and supervisors. (R. at 207-08.) Dr. Lanthorn also opined that the plaintiff had marked limitation in three other areas concerning changes in routine work setting, responses to work pressures, and interacting with co-workers. (R. at 208.)

The plaintiff worked as a manager for a small retail store in Grundy, Virginia until it closed in June of 2004. (R. at 28-29.) After she was laid off, she continued to seek employment close to the area where she lived, but was not successful. (R. at 29.) The plaintiff was offered a similar position by her former employee at a store in Richlands, Virginia, but declined because she felt the one-hour drive was too long. (R. at 30.) She also testified that she believed she could not work because of the physical strain and sleep deprivation she experienced from caring for her husband.

Many of the plaintiff's reported daily activities revolve around caring for her partially paralyzed husband who requires around-the-clock care. The plaintiff has served as her husband's primary care giver since his stroke in April of 2003. Since the plaintiff lost her job, she stays at home to care for her husband a majority of the time. A nurse's aid assists the plaintiff for four hours a day five days a week. (R. at 32.)

In caring for her husband, the plaintiff has to help lift him on and off the toilet and also has to help him get on and off the bed. (R. at 32-33.) She described lifting

his legs onto the bed as being particularly difficult. The plaintiff prepares lunch and dinner for herself and her husband, and runs various errands while the nurse's aid stays with her husband. (R. at 33.) She is able to drive a car. (R at 107.) She also tends to all the house work and occasionally does laundry. (*Id.*) The plaintiff also reported that she attends church once or twice a month. (R. at 34.) She also talks on the phone daily and has no problem getting along with family, friends, neighbors, and authority figures. (R. at 111-113.)

The plaintiff testified that before the nurse's aid began coming in March of 2005, she spent nearly a year taking care of her husband without assistance. According to the plaintiff, this was burdensome and made her feel depressed. (R. at 35.)

II

The plaintiff bears the burden of proving she is under a disability. 42 U.S.C.A. §§ 423, 1328(c); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983). The Commissioner applies a five-step sequential evaluation process when assessing an applicant's disability claim. The Commissioner considers, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had a condition which met or equaled the severity of a listed impairment; (4) could

return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520 (2006). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See* § 404.1520(a); *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

In arriving at the decision that the plaintiff was not disabled, the ALJ rejected the opinion of Dr. Lanthorn. The plaintiff contends that the ALJ erred in her decision because she did not properly reject Dr. Lanthorn's opinion. Therefore, the issue in this appeal is whether the record provided a proper basis for the ALJ to disregard the findings of Dr. Lanthorn.

As stated above, the court's role in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. Where there is substantial evidence to support the finding below, this court may not substitute its judgment for that of the Commissioner. *See Hays v Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In determining whether substantial evidence supports the Commissioner's decision, I must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Considering the plaintiff's own reported daily activities and the medical evidence in the record, it was proper for the ALJ to reject the functional limitations which Dr. Lanthorn assessed. The ALJ relied on evidence in the record to discredit Dr. Lanthorn's finding that the plaintiff has marked functional limitations. Specifically, in rejecting Dr. Lanthorn's finding, the ALJ was entitled to rely on the plaintiff's own testimony. The plaintiff testified that if she were offered another position as a store manager that did not require her to unload trucks that her acceptance of such a job would be contingent on whether it paid enough for her to afford to hire someone to assist in the care of her husband while she worked. (R. at 41.)

Additionally, the plaintiff mainly described difficulties associated with the demands of caring for her husband as the main factors that prevented her from working. Particularly, she testified that she could not work because she had to get up every hour during the night to care for her husband. (R. at 42-43.) The plaintiff repeatedly described sleep depravation related to the care of her husband as a major obstacle to her ability to work. (R. at 47.)

This testimony provided the ALJ an adequate basis to conclude there was a non-medical basis for the plaintiff's unemployment.

Furthermore, the plaintiff's own reported daily activities contradict a finding that she is disabled. The plaintiff essentially works a full-time job caring for her partially paralyzed husband. She is his primary caretaker and spends many hours each day working in the home to tend to his needs. Although she is assisted several hours a week by a nurse's aid, the bulk of her husband's care falls upon her. In order to receive disability benefits, a claimant must have medically determinable impairments which functionally limit her in such a substantial way that she cannot work for either physical or mental reasons.

In this case, the plaintiff's reported daily activities of lifting her husband, caring for his basic needs, cooking, cleaning, doing laundry, driving, running errands, and shopping, support the finding that she is not disabled under the Act. Her own testimony shows that her inability to work primarily stems from her husband's health problems and not her own. As the ALJ stated and the Commissioner readily concedes, Mrs. Charles is truly an admirable person for the devotion she has shown to her husband and the level of care she has provided him over the years. Unfortunately for her, the Act does not provide disability benefits in a situation where a person's inability to work stems from a need to remain in the home to care for an ill family member.

Aside from considering the plaintiff's reported daily activities, the ALJ also properly disregarded Dr. Lanthorn's assessment. The relevant regulations outline factors that an ALJ is to consider when weighing a medical opinion. Among these are: (1) the examining relationship; (2) the length of treatment relationship and the frequency of the examination; (3) the nature and extent of the treatment relationship; (4) the degree to which evidence supports the opinion; (5) the consistency of the record as a whole; (6) the specialization of the physician; and (7) other factors. *See* 20 C.F.R. § § 404.1527(d)(1)-(6), 416.927(d)(1)-(6) (2006). No statute, regulation, or case law requires an ALJ to accord the opinion of a consultative examiner the weight of a treating physician. Moreover, the regulations allow for the rejection of a medical source opinion when that opinion is inconsistent with other evidence and not well-supported. 20 C.F.R. § 404.1527(d)(3),(4) (2006).

In comparing the plaintiff's reported daily activities and her testimony to Dr. Langthorn's assessment, the ALJ was entitled to reject Dr. Lanthorn's findings. The ALJ articulated several contradictions between those findings and the plaintiff's daily activities. In particular, the ALJ noted that Dr. Lanthorn failed to consider that a situational stressor—caring for her disabled husband—might have contributed to the plaintiff's complaints and overall mental and physical condition.

-13-

Additionally, the ALJ remarked on internal inconsistencies within the report drafted by Dr. Lanthorn. For example, Dr. Lanthorn assessed the plaintiff as having marked limitations. However, such an assessment arguably contradicts the GAF rating of fifty-sixty he assigned to the plaintiff. The ALJ pointed out that such a GAF score equates to the higher end of moderately limiting functioning, and borders on mild symptoms which are rated at sixty-one. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32.

III

For the forgoing reasons, the plaintiff's motion for summary judgment will be denied, and the Commissioner's motion for summary judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: May 4, 2007

/s/ JAMES P. JONES
Chief United States District Judge

-14-